LAW OFFICE OF SANDRA D. PARKER
444 Madison Avenue, Suite 1710
New York, NY 10022
(212) 317-2883
Sandra D. Parker
Attorney for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
MAUVAREEN BEVERLEY,

|  |  |  |
|---|---|---|
|  | Plaintiff, | ECF CASE |
| -against- |  | FIRST AMENDED COMPLAINT AND JURY DEMAND___ |

NEW YORK CITY HEALTH AND            18 CIV. 08486 (ER)
HOSPITALS CORP., MITCHELL
KATZ, Individually and as Chief Operating
Officer and President of New York City Health
and Hospitals Corp., STANLEY BREZENOFF,
Individually and as Interim Chief Operating
Officer and President of New York City Health
and Hospitals Corp., PLACHIKKAT V.
ANANTHARAM, Individually and as Chief
Financial Officer of New York City Health and
Hospitals Corp.,

                                        Defendants.
------------------------------------------------------------x

        Plaintiff, Mauvareen Beverley, for her First Amended Complaint (Complaint)

against the Defendants, respectfully alleges as follows:

                        JURISDICTION AND VENUE

    1.      Plaintiff Mauraveen Beverley (Beverley) brings this action for declaratory

judgment, injunctive relief and damages against the Defendants to redress the deprivation under color of state law, of the rights, privileges and immunities secured to Beverley, by the Fourteenth Amendment of the United States Constitution, pursuant to the Civil Rights Act of 1866 (as amended), 42 U.S.C. sec, and 1981, the Civil Rights Act of 1871 (as amended), 42 U.S.C. sec. 1983.

2.    Defendants subjected Beverley to discriminatory treatment because of her race and Caribbean descent, created a hostile environment in which she was forced to work and took retaliatory action against her for complaining about their discriminatory conduct, all in violation of 42 U.S.C. se. 1981 and 42 U.S.C. sec. 1983.

3.    Beverley further brings this action pursuant to the New York City Human Rights Law, N.Y. Admin Code sec. 8-107 set seq. (NYCHRL. for declaratory judgment, injunctive relief and damages against the Defendants, for unlawful employment practices and employment discrimination, based on Beverley's race, Caribbean descent, age and gender, for retaliation and subjecting Beverley to a hostile work environment.

4    The Defendants subjected Beverley to disparate and unequal treatment based on her race, Caribbean descent, gender and age.

5.    The actions and conduct of Defendants had a disparate impact upon Beverly based her race, Caribbean descent, gender and age.

6.    Jurisdiction over the subject matter of this Complaint is conferred on this Court pursuant to 28 U.S.C. sec. 1331, 28 U.S.C. sec. 1343, 42 U.S.C. sec. 1981, and 42

U.S.C. sec. 1983.  This Court's pendent jurisdiction is invoked pursuant to 28 U.S.C.

1367(a). Beverley further invokes this Court's jurisdiction pursuant to 28 U.S.C. sec.

2201 and 2202.

7.      The venue of this action is properly placed in the Southern District of New

York, pursuant to 28 U.S.C. sec. 1391(b).

PARTIES

8.      Beverley  is an African-American female citizen of the United States.

9.      Beverley was born in 1952,  is currently sixty-six years old, and is of

Caribbean descent.

10.     Beginning in 2007 Beverley worked in various positions within the

 Defendant New York City Health and Hospitals Corp.  (HHC) organization, until in or

about January 2018, when Defendants wrongfully terminated her employment based on

their animus directed against Beverley because of her race, Caribbean descent, age and

gender.

11.     At all times relevant herein Beverley was an "employee" of the Defendants,

within the meaning of the NYCHRL.

12.     At all times relevant herein, Defendants were Beverley's "employers" within

 the meaning of NYCHRL.

13.     Upon information and belief, the Defendant  HHC  at all times relevant

herein, was and continues to be a public benefit corporation, which provides health care

3

services to the New York City public, through a network of eleven acute care hospitals, and other health care facilities.

14.    Upon information and belief, HHC's  principal office is located at 125 Worth Street, New York, NY 10013.

15.    Upon information and belief Defendant Mitchell Katz (Katz) is the President and Chief Executive Officer of Defendant HHC, assuming said position in or about January 2018.

16.    Upon information and belief at all times relevant herein Defendant Stanley Brezenoff (Brezenoff) was the Interim President and Chief Executive Officer of Defendant HHC.

17.    Upon information and belief, at all times relevant herein Defendant  Plachikkat V. Anantharam (Anantharam) was the Chief Financial Officer of Defendant HHC, and the head of the Central Finance Office at HHC (Finance).

18.    At all times relevant herein, Defendants made daily decisions regarding Beverley's employment, possessed and exercised the authority to hire Beverley and to terminate Beverley's employment, had the authority and exercised the authority to supervise and control Beverley's working conditions, had the power and exercised the power to determine Beverley's compensation, and had control over the conduct and activities which give rise to claims that are the subject of this Complaint.

19.    Defendants exercised power and control and are the final policy makers with

4

respect to the practices, policies and procedures maintained regarding their employees, including those that are the subject of this Complaint.

20.    Defendants acted together in promulgating, enforcing and maintaining the practices and policies referred to and complained of herein.

21.    At all times relevant herein, Defendants are and were responsible for the acts of their staff, supervisors and officers, who were acting within the scope of their employment and under the color of law, pursuant to a policy, custom and/or practice of gender, age, race and ethnic  discrimination, and in violation of an individual's right to equal protection, provided by the Fourteenth Amendment of the United States Constitution.

22.    At all times relevant herein Defendants acted under color of law.

23.    At all times relevant herein Defendants Katz, Brezenoff, and Anantharam acted within the scope of their employment.

24.    Defendant HHC has a history of denying African-Americans the opportunity to hold  high ranking managerial positions such as Assistant Vice President and higher, within the management structure of HHC, based on a discriminatory animus directed against African-Americans because of their race and/or ethnicity.

25.    Defendant HHC has a history of denying African-Americans the opportunity for promotions to these high ranking managerial positions within the management structure of HHC, based on a discriminatory animus directed against African-

Americans because of their race and/or ethnicity.

26.    The decisions and conduct of HHC regarding the hiring and retention of employees to these high ranking managerial positions within the management structure of HHC disparately impacts African-Americans and African-Americans of Caribbean descent.

27.    The decisions and conduct of HHC regarding promotions of employees to these high ranking managerial positions within the management structure of HHC disparately impacts African-Americans and African-Americans of Caribbean descent.

28.    Defendant HHC has a history of hiring non-African American employees to work in these high ranking managerial positions, with corresponding high salaries, despite the fact that they lack sufficient qualifications and/or experience.

29.    Defendant HHC has a history of promoting non-African American employees to work in these high ranking managerial positions for which they lack sufficient qualifications and/or experience.

30.    Defendant HHC has a history of ignoring the poor performance of non-African-American employees hired to work and/or who are promoted to work in these high ranking managerial positions.

31.    Defendant HHC has a history of failing to take corrective measures to address the poor and deficient performance of non-African-American employees hired to work in and/or promoted to these high ranking managerial promotions.

32.    Defendant HHC and in particular the Central Office of HHC and Finance have engaged in the above practices, and upon information and belief continue to engage in the above described practices.

33.    Among Caucasian male employees who are beneficiaries of the above described practices is upon information and belief Frederick Covino (Covino), who holds the position of Assistant Vice President, and works on budget matters.

34.    Covino is male and substantially younger than Beverley.  Upon information and belief, Covino is approximately fifty-four years old, and has been employed with HHC for approximately a decade.

35.    Upon information and belief, for years he has performed his duties in a deficient manner.

36.    Upon information and belief, HHC rewards Covino for his deficient performance by promoting him from the position of Director to  Assistant Vice President, and raising his salary.

37.    Upon information and belief, as recent as 2017 or 2018 he made serious errors in performing his duties, by among other things providing incorrect data on which HHC relied to fashion its budget.

38.    Upon information and belief Covino's errors resulted in a major miscalculation of HHC's budget needs.

39.    Upon information and belief Defendants Katz, Brezenoff and Anatharam

were aware of Covino's errors, but took no action to discipline him.

40.    Upon information and belief Covino continues in his position.

41.    In addition to Covino, other employees include upon information and belief Brenda Schultz (Schultz), a Caucasian Assistant Vice President who works in HHC's Information Technology (IT) Department in Finance, and who is approximately forty years old.

42.    Upon information and belief Schultz lacks the requisite qualifications for the position of Assistant Vice President, in the IT Department of Finance and incompetently performed her duties.  Upon information and belief Schultz has been employed with HHC for approximately a decade.

43.    Upon information and belief, Schultz deficient and incompetent performance has stalled and prevented HHC from properly implementing the EPIC healthcare software system, at its eleven acute health care hospitals.

44.    Upon information and belief, Schultz continues to hold her position of Assistant Vice President of the IT Department, and continues to be paid her high salary.

45.    When Defendants erroneously believed that Beverley had made an error in providing certain data for their use, they moved swiftly to condemn and publicly berate and humiliate her before her colleagues and before a third party vendor, falsely accusing her of incompetence.

46.    Defendants further sought to bar Beverley from continuing to work on the

projects that they erroneously believed were the result of her alleged errors and deficient execution of her duties.

47.    Defendants failed and refused to apologize to Beverley after she demonstrated, she had made no such error or otherwise deficiently performed her duties.

48.    In fact it was Robert Melican (Melican) and Maxine Katz (Katz), the Caucasian employees whom Defendant Anantharam appointed to oversee certain projects on which Beverley worked, who committed said errors, and who otherwise prevented Beverley from performing her duties.

49.    Said Caucasian employees lacked the knowledge and expertise regarding the subject matter of those projects, were not Beverley's supervisors and Melican as Director, held a title below the Assistant Vice President position Beverley held.

50.    No action was taken against said Caucasian employees.

51.    Defendants and in particular Defendant Anantharam permitted said Caucasian employees to continue overseeing Beverley's work on those projects.

52.    Defendants and in particular Defendant  Anantharam did not subject Caucasian employees and in particular the Caucasian employees holding the position of Assistant Vice President,  to the above treatment.

53.    Defendants also hired and/or promoted non-African American employees to managerial positions such as chief of staff and corporate controller, previously held by African-Americans.

54.    Upon information and belief, said non-African American employees did not possess sufficient qualifications and/or experience for the positions.

55.    Upon information and belief, said non-African American employees were less qualified and/or possessed less experience than what Defendants required the African-Americans they replaced,  to have and to possess for the positions.

56.    Upon information and belief Defendants paid said non-African Americas employees a salary higher than and/or commensurate to the salaries they paid to the more qualified African-Americans they replaced.

57.    Prior to assuming his position in or about January 2018 and in conjunction with Defendants Brezenoff and Anantharam, Defendant Katz made decisions regarding the staffing at HHC.

58.    Prior to assuming his position in or about January 2018 and in conjunction with Defendants Brezenoff and Anantharam, Defendant Katz made decisions regarding the staffing at HHC, including employees working in Finance such as Beverley.

59.    Defendants Katz, Brezenoff and Anantharam worked together and made decisions regarding the staffing at HHC, including the decision to hire four Caucasian male employees, to assume upper management positions with HHC.

60.    Upon information and belief all four male Caucasian employees are substantially younger than Beverley.

61.    Upon information and belief, Brezenoff described his work with Defendants Katz to hire said four Caucasian upper management employees,  as the "result of many

weeks of collaborative work with," with Katz.

    62.    In addition to the foregoing "collaborative work" with Brezenoff, Defendant Katz made decisions regarding the hiring and termination of employees, working for HHC, including Beverley.

    63.    Upon information and belief Defendant Katz participated in the decision to terminate Beverley's employment.

    64.    Defendant Katz made the decision to deny Beverley's request to rescind her termination.

    65.    Defendant Brezenoff made decisions regarding the hiring and termination of employees, working for HHC, including Beverley.

    66.    Defendant Brezenoff  participated in the decision to terminate Beverley's employment.

    67.    Defendant Brezenoff participated in the decision to deny Beverley's request to rescind her termination.

    68.    Defendant  Anatharam made decisions regarding the hiring and termination of employees working for HHC, including Beverley.

    69.    Defendant Anantharam participated in and was involved in the decision to terminate Beverley's employment.

    70.    Defendant Anathram participated in the decision to deny Beverley's request to rescind her termination.

FACTS

71.     Upon information and belief, Defendant HHC established and maintains the Equal Employment Opportunity Program and Affirmative Action Plan (EEO Plan), also known as Operating Procedure No. 20-32.

72.     Upon information and belief, the EEO Plan established policies and procedures regarding among other things, the recruitment and retention of senior managers, officers and directors working for HHC, including Beverley.

73.     Upon information and belief, Defendants Katz and Brezenoff are responsible for and accountable for implementation and enforcement of the policies and procedures set forth in the EEO Plan.

74.     Upon information and belief, the EEO Plan requires Defendant Anantharam  and other employees working for  Defendant HHC to adhere to its terms and provisions.

75.     Among other things, the EEO Plan prohibits discrimination based on race, ethnicity, age and gender directed against applicants for employment with HHC and employees working for HHC, prohibits discriminatory personnel actions, and mandates a fair and prompt disposition of claims related to the applications of the policies set forth therein.

76.     Pursuant to the discriminatory practices described herein, Defendants have violated the terms of said EEO Plan.

77.     In accordance with the discriminatory practices described herein and

contrary to the terms of the EEO Plan, Defendants among other things, did not implement a system for conducting evaluations of its management employees working in Finance, and/or the Central Office.

78.    In accordance with the discriminatory practices described herein and contrary to the terms of the EEO Plan, Defendants among other things, continued their practice of assessing the competence and performance of its management employees, based their race, ethnic background, age and/or gender.

79.    Beverley is a former employee of the Defendants, and a Medical Doctor.  In or about 1981 Beverley earned the M.D. Degree from the University of Buffalo School of Medicine.

80.     In or about 1984 Beverley completed her internship and residency in Internal Medicine, at Harlem Hospital, one of the several hospitals within the HHC organizational network.

81.    In or about 2007 Beverley began her employment with HHC, as an Associate Executive Director of Care Management at the Queens Health Network.   She held the position for approximately four years, until in or about 2011.

82.    During her tenure as Associate Director of Care Management, Beverley performed her duties in an exemplary manner.

83.    Beverley created, implemented  and oversaw numerous projects and initiates at the Queens Health Network, including the Care Management Program for Elmhurst Hospital and Queens Hospital, the first sickle cell support group at Queens Hospital, and

an external appeals process to challenge inappropriate denials of reimbursement.

84.    From in or about 2011 to in or about 2014, Beverley held the position of Deputy Executive Director, Care Management at Kings County Hospital.  As Deputy Executive Director, Beverley performed her duties in an exemplary manner.

85.    Among the projects Beverley created, implemented and oversaw in her position of Deputy  Executive Director was a care management program.  Beverley also worked to  decrease from 30% to 18.7%, the 30-day re-admissions for congestive heart failure patients.

86.    Beverly further initiated, implemented and oversaw other projects that increased revenues by $22 Million Dollars and that generated $5 Million Dollars in savings.

87.    Beverley was a finalists in the National Competition for the John Q. Sherman Patient Engagement Award.

88.    In or about 2015 Beverley began working in  the position of Assistant Vice President, Physician Advisor in Finance/Managed Care.

89.    Beverley's duties included developing initiatives related to medical necessity denials and appeals, involving the eleven acute care hospitals within the HHC network.

90.    Beverley performed her duties in an exemplary manner.

91.    At no time during Beverley's employment did Defendants state that her performance was in any manner deficient.

92.    When Beverley began working in Finance she reported to Marlene Zurack

14

(Zurack), the head of Finance.

93.    Zurack is Caucasian and at that time held the position a Senior Vice President and the Chief Financial Officer.

94.    In or about 2016, Zurack left her position with Defendant HHC.

95.    HHC replaced Zurack with Defendant Anantharam.

96.    Defendant Anathram is of Indian-descent and assumed the position of head of Finance and Chief Financial Officer.

97.    Defendant Anantharam replaced Zurack as Beverley's supervisor.

98.    Defendant Anantharam was responsible for the direct supervision of management staff at Central Office, such as  Beverley, Christi Olson (Olson), and Megan Meagher (Meagher), all of whom held the position of Assistant Vice President.

99.    Olson and Meagher are Caucasian employees.

100.    Olson and Meagher upon information and belief are less than forty years old.

101.    Defendant Anantharam held one and one meetings with his staff, including Olson and Meager, to among other things, discuss the projects on which they were working and to address their concerns.

102.    Defendant Anantharam, after initially holding a few one and one meetings with Beverley, discontinued the practice, including dismissing Beverley's requests to meet with him about her work.

103.    Defendant Anantharam discontinued holding one and one meetings with

Beverley, while continuing to hold one and one meetings with the Caucasian Assistant Vice Presidents and other Caucasian managers in Finance.

104.    Defendant Anantharam did not subject Caucasian management employees such as  Olson and Meagher to such treatment.  He was receptive to and responded positively to their concerns and ideas.

105.    During staff meetings, Defendant Anantharam responded positively to the comments, suggestions and input given by Olson, Meager, Melican and others.

106.    During staff meetings, Defendant Anantharam responded to comments, suggestions and input Beverley gave by challenging or dismissing them, and treating them, as unworthy of consideration.

107.    He did not challenge or dismiss the comments, suggestions and input given by younger managers, male managers and non-African American managers of Caribbean descent.

108.    Defendant Anantharam treated Beverley's comments, inputs and suggestions as not being worthy of consideration or discussion because of his discriminatory animus directed against her on account of her race, ethnicity, age and/or gender.

109.    Defendant Anantharam relegated Beverley to the back seat in Finance.

110.    Notwithstanding Defendants' conduct, during her tenure in Finance, Beverley developed and implemented a medical necessity denial and appeal  process, which resulted in recoupment of approximately $8 Million Dollars.

111.    Other initiatives, projects and programs Beverley oversaw, resulted in

savings to Defendant HHC of $24 Million Dollars, and in increased revenues by more than $8.5 Million Dollars.

112.    The foregoing positive results and achievements were above and beyond the achievements of the other managers working Finance, in particular the Caucasian managers.

113.    Instead of praising or acknowledging Beverly's performance and achievement, Defendants and in particular Anantharam was dismissive of these results, ignoring them and refusing to recognize Beverley's achievements.

114.    Instead of acknowledging and rewarding Beverly's performance and achievements, by raising her salary and/or giving her a promotion, Defendants and in particular Anantharam denied Beverley a promotion or salary increase, while upon information and belief promoting and/or raising the salaries of Caucasian employees, who were deficient in the performance of their duties, who made errors in executing their duties and who lacked the competence to properly perform their duties.

115.    Upon information and belief, those employees included Covino, Melican, Olson and Meagher.

116.    During Anantharam's tenure as Chief Financial Officer he only promoted and/or raised the salaries of non-African American employees and non-African American employees of Caribbean descent, such as Covino, Melican, Olson and Meager.

117.    Defendants and in particular Defendant Anatharam authorized management employees such as Olson and Meagher to undertake work and execute projects they had

originated, without requiring and/or permitting other employees to oversee and take charge

of their work.

118.    Defendant and in particular Defendant Anantharam even authorized

management employees below the rank of Assistant Vice President, such as Melican who

held the title of Director,  to undertake work and execute projects they had originated,

without requiring other employees to oversee and/or take charge of their work.

119.    Defendants and in particular Defendant Anantharam did accord Beverley the

same treatment, he accorded to the Caucasian Assistant Vice Presidents and the Caucasian

Directors, younger than sixty years old..

120.    Defendants and in particular Defendant Anantharam required Beverley to

work with and to obtain the approval of Caucasian employees who were not her

supervisors, and who had no background, experience or expertise in the areas covered by

her projects.

121.    Defendants and in particular Defendant Anantharam required Beverley to

work with and obtain the approval Melican, who upon information has a legal background

and Katz, who upon information and belief has a background in education.

122.    Neither Katz nor Melican had the technical expertise, such as the expertise

of  a clinician that Beverley possessed, to work on the medical necessity projects.

123.    Based on the foregoing, according to Defendants, the only qualifications

Melican and Katz had and/or needed to oversee Beverley's work on projects she initiated

was the fact that they are both Caucasians, and one is male substantially younger than

18

Beverley.

124.    This set up interfered with and prevented Beverley from properly executing her duties, resulted in said overseeing Caucasian employees making errors and mistakes on the projects, and then attempting to attribute their incompetence and errors to Beverley.

125.    Said overseeing Caucasian employees issued reports laden with errors, and presented error laden reports as the product of Beverley's work, when Beverley had no hand in said reports.

126.    Said overseeing Caucasian employees excluded Beverly from meetings regarding the projects she initiated and for which she bore responsibility, attempted to pass off her work as the product of their efforts, and barred Beverley from communicating with anyone regarding the projects.

127.    Beverley is the only Assistant Vice President in Finance who was subject to such humiliating and marginalizing treatment.

128.    Defendants and in particular Defendant Anantharam was aware of the above treatment of Beverley.

129.    Defendants and in particular Defendant Anatharam initiated, authorized, acquiesced and condoned said treatment of Beverley.

130.    In the view of Defendants and in particular in the view of Defendant Anantharam, Beverley as an African-American female, over the age of sixty and of Caribbean descent should not fully and was prevented from fully exercising her managerial role as an Assistant Vice President in Finance.

131.    Defendants and in particular Defendant Anantharam also denied Beverley the resources he provided to other managers in Finance, and which she needed to adequately perform her duties.

132.    Despite the fact that Beverley's duties required her to interface with the eleven hospitals, and that she needed a staff to properly execute those duties, Anantharam denied Beverley a staff to assist her.

133.    Defendant Anantharam did not deny Caucasian and younger Assistant Vice Presidents such as Olson and Meagher, personnel staff to assist them.

134.    Defendant Anantharam did not deny Caucasian male employees holding titles below Assistant Vice President, such as Melican of personnel staff to assist him. .

135.    Beverley complained to Anantharam regarding the foregoing discriminatory treatment.

136.    Defendant Anatharam dismissed her complaints, and thereafter took retaliatory action against her.

137.    Despite Defendant Anatharam's refusal to hold one and one meetings with Beverley as he did with the Caucasian managers, Beverley continued in her efforts to report to him, the projects on which she worked, and continued to seek his assistance to handle concerns she had in performing her duties.

138.    Instead of responding to her ideas, suggestions and concerns about the projects or discussing them, Defendant Anantharam directed her to have two Caucasian employees evaluate her concerns and ideas, and then report back to him.

139.    Thus, Defendant Anantharam would not even entertain or consider Beverley's suggestions or ideas, until and unless they received the imprimatur of Caucasian employees, to whom she did not report, who little expertise in the areas of concern,  and who had no supervisory responsibilities over Beverley.

140.    Defendant Anantharam did not subject the Caucasian managers to such treatment.

141.    Defendant Anantharam also questioned Beverley about her Carribean background and made comments about his lack of affinity for the United States' "African-American experience."

142.    In addition to Beverley, upon information and belief,  another employee of HHC was subject to disparaging remarks regarding his Caribbean background, with subordinate Caucasian employees challenging his authority, questioning his competence and abilities, based on the fact that he had a Caribbean background.

143.    In or about August  2017, Anantharam appointed Melican, Beverley's supervisor, requiring her to directly report to Melican instead of him, requiring Beverley to obtain Melican's approval for all matter of work she performed, including approving and signing her time sheets.

144.    At that time Melican was approximately forty-years old and held the position of Director.

145.    The position of Director is below that of the Assistant Vice President position held by Beverley.

146.    Beverley was the only employee in Finance, who Anantharam placed under the supervision of someone holding a position and title lower than the one she held.

147.    Defendant Anantharam did not subject non-African American employees, to such treatment.

148.    Defendant Anantharam did not require Caucasian employees, such as Meagher and Olson, to report to and be supervised by anyone holding a position and title of Director.

149.    Defendant Anantharam supervised Meagher and Olson.

150.    Defendant Anantharam appointed Melican as Beverley's supervisor, despite her numerous complaints about his berating and belligerent conduct directed against her, the errors he made on projects, his attempts to blame Beverley for his errors and his general incompetence.

151.    The actions of Defendant Anantharam further humiliated, marginalized and distressed Beverley.

152.    In or about 2017, Finance was directed to conduct by the latest December 2017, performance evaluations of its management employees, including those holding the positions of Director, Assistant Vice President and above.

153.    Defendants did not conduct a performance evaluation for Beverley by December 2017 or at anytime during her tenure at Finance.

154.    Upon information and belief Defendants did not conduct a performance evaluation of any of the managerial employees during Beverley's tenure in Finance, and

22

before her tenure.

155.    However, Defendants promoted and/or raised the salary of various non-African American employees, who were male and/or female, and/or who were substantially younger than Beverley.

156.    Defendant Anantharam raised the salaries of Caucasian employees holding positions for which they were not qualified and/or performed the duties of said position poorly.

157.    Among the Caucasian employees whom Anantharam promoted and/or gave raises were Covino, Melican, Olson and Meagher.

158.    Defendants denied Beverley a salary increase, while increasing the salary of the above managers, and others.

159.    Defendants denied Beverley a promotion, while promoting the above managers.

160.    Defendants denied Beverley's requests for personnel staff needed to complete her projects.  Defendants instead increased the staff of other managers.

161.    Beginning in or about August 2017, when Defendant Anatharam appointed Melican as Beverley's supervisor, he also excluded Beverley from senior staff meetings, and conferences that the other Assistant Vice Presidents such as Olson and Meager attended.

162.    Beginning in or about November 2017, Defendants and in particular Defendant Anantharam cut off all of Beverley's communications with the other

managers in Finance.   He directed that Beverley stop receiving and Beverley did stop

receiving emails and other communications exchanged among senior managers.

163.    Approximately one month thereafter, on or about December 18, 2017

Defendants and in particular Defendant Anantharam told Beverley she had two days to

submit a letter of resignation.

164.    He did not point to any poor performance or deficiency in her performance

as the reason for his conduct.

165.    Defendants subjected Beverley to the above treatment because of

their discriminatory animus directed against Beverley because of race, ethnicity, age

and/or gender, and in retaliation for her complaints about their conduct.

166.    The above treatment to which Defendants subjected  Beverley violated the

terms and provisions of the EEO Plan.

167.    Beverley complained to Defendants and in particular Defendant Brezenoff,

regarding the demand for her resignation and other discriminatory treatment.  Defendants

and in particular Defendant Brezenoff in violation of the EEO Plan, ignored her

complaints.

168.    In or about January 2018, Defendants terminated Beverley's employment.

169.    Beverley complained to Defendants and in particular Defendant Katz,

regarding her termination and other discriminatory treatment.  Defendants and in

particular Defendant Katz in violation of the EEO Plan, ignored her complaints.

170.    Upon information and belief, following Beverley's termination, Defendants

promoted Melican and other Caucasian employees and/or gave them salary increases.

171.    Upon information and belief, following Beverley's termination Melican assumed Beverley's responsibilities and duties.

172.    Upon information and belief, following Beverley's termination, Defendants hired Caucasian employees and employees under the age of sixty to perform the duties Beverley previously performed.

173.    Upon information and belief, following Beverley's termination, Defendants increased the Finance staff, by hiring Caucasian and younger employees to fill positions in the unit.

174.    Despite her efforts, Beverley has not found comparable employment.

175.    Defendants in further retaliation against Beverley, upon information and belief, have disparaged and blackballed Beverley for her complaints regarding their discriminatory treatment, including the wrongful termination, thereby impairing her ability to obtain comparable employment.

COUNT I AGAINST DEFENDANTS
KATZ BREZENOFF AND ANANTHARAM
<u>IN THEIR OFFICIAL CAPACITIES</u>

176.    Beverley repeats and realleges each and every allegation set forth in paragraphs 1 through 175 of this Complaint, with the same force and effect as if set forth herein.

177.    Defendants Katz, Brezenoff and Anatharam were the final policy makers and/or decision makers who acted under color law with respect to the discriminatory

treatment and decisions affecting Beverley's terms and conditions of employment.

178.   At all times relevant herein, Defendants Katz, Brezenoff and Anatharam acted with in the scope of their employment.

179.   Beverley has a constitutionally protected right of equal protection under the law, guaranteed through the Fourteenth Amendment of the United States Constitution, and made enforceable pursuant to 42 U.S.C. sec. 1983.

180.   Defendants Katz, Brezenoff and Anatharam intentionally and wilfully violated Beverley's right of equal protection under the law, in violation of 42 U.S.C. sec. 1983.

181.   Defendants Katz, Brezenoff and Anatharam subjected Beverley to the foregoing treatment because of her race and ethnicity.

182.   Defendants Katz, Brezenoff and Anatharam denied Beverley equal protection of the law, and the full and equal benefits of all laws and proceedings for the security of her employment, because of Beverley's race and ethnicity, in violation of the Fourteenth Amendment of the United States Constitution, and 42 U.S.C. sec. 1983.

183.   As a proximate result of Defendants' conduct, Beverley has suffered and continues to suffer substantial losses, including the loss of past and future earnings, career advancement, and other employment benefits.

184.   As a proximate result of Defendants' conduct, Beverley has suffered and continues to suffer impairment and damage to her good name and reputation.

185.   As a proximate result of Defendants' conduct, Beverley has suffered and

continues to suffer severe lasting embarrassment, humiliation and anguish, and other incidental and consequential damages and expenses.

186.    The conduct of the Defendants was outrageous and malicious, was intended to injure Beverley, and was done with reckless indifference to Beverley's protected civil rights, entitling Beverley to an award of punitive damages.

COUNT II AGAINST DEFENDANTS HHC,
AND KATZ, BREZENOFF AND ANATHARAM
IN THEIR OFFICIAL CAPACITIES

187.    Beverley repeats and realleges each and every allegation set forth in paragraphs 1 through 175 of this Complaint, with the same force and effect as if set forth herein.

188.    The discriminatory acts of which Beverley complains were done pursuant to a larger custom, policy or practice of discrimination maintained by Defendants in violation of 42 U.S.C.  sec. 1983.

189.    As a proximate result of defendants' actions, Beverley has suffered and continues to suffer substantial losses, including the loss of employment opportunities, and other employment benefits.

190.    As a proximate result of Defendants' conduct, Beverley has suffered and continues to suffer severe lasting embarrassment, humiliation and anguish, and other incidental and consequential damages and expenses.

COUNT III AGAINST DEFENDANTS
KATZ, BREZENOFF AND ANATHARAM
IN THEIR INDIVIDUAL CAPACITIES

191.    Beverley repeats and realleges each and every allegation set forth in

paragraphs  1 through 175 of this Complaint, with the same force and effect as if set forth

herein.

192.    Defendants Katz, Brezenoff and Anatharam subjected Beverley to

discriminatory treatment, based of her race and thereby deprived Beverley of her right to

make and enforce contracts and to the full and equal benefits of all laws and proceedings

for the security of her employment, in violation of the Fourteenth Amendment of the

United States Constitution and 42 U.S.C. sec. 1981.

193.    As a proximate result of Defendants' conduct, Beverley has suffered and

continues to suffer substantial losses, including the loss of employment opportunities, and

other employment benefits.

194.    As a proximate result of Defendants' action, Beverley has suffered and

continues to suffer impairment and damage to her good name and reputation.

195.    As a proximate result of Defendants' actions, Beverley has suffered and

continues to suffer severe and lasting embarrassment, humiliation and anguish, and other

incidental and consequential damages and expenses.

196.    The conduct of Defendants was outrageous and malicious, was intended to

injure Beverley , and was done with a conscious disregard of Beverley's civil rights,

entitling Beverley to an award of punitive damages.

COUNT IV AGAINST DEFENDANTS
HHC AND KATZ, BREZENOFF AND
ANATHARAM IN THEIR INDIVIDUAL
CAPACITIES

197.    Beverley repeats and realleges each and every allegation set forth in

paragraphs  1 through 175 of this Complaint, with the same force and effect as if set forth

herein.

198.    Defendants subjected Beverley to disparate treatment because of her race,

and forced her to work in a hostile environment.

199.    By virtue of their actions, policies, employment practices and conduct

directed against Beverley, Defendants deprived Beverley of her constitutional rights of

equal protection under the law in violation of 42 U.S.C. sec. 1983.

200.    Defendants' conduct was willful and intentional and caused the deprivation

of Beverley's constitutional rights of equal protection of the law.

201.    At all times relevant herein, Defendants acted under the color of state law in

willfully and purposefully depriving Beverley of her constitutionally guaranteed rights.

202.    As a proximate result of Defendants' discriminatory conduct, custom,

practice or policy, Beverley  has suffered and continues to suffer impairment and damage

to her good name and reputation.

203.    As a proximate result of Defendants' discriminatory conduct, custom,

practice or policy, Beverley has suffered and continues to suffer severe lasting

embarrassment, anxiety, humiliation, shame and anguish, and other incidental and

consequential damages and expenses.

COUNT V AGAINST DEFENDANTS
HHC AND KATZ, BREZENOFF AND
ANANTHARAM IN THEIR OFFICIAL
AND INDIVIDUAL CAPACITIES

204.   Beverley repeats and realleges each and every allegation set forth in

paragraphs 1 through 175  of this Complaint, with the same force and effect as if set forth

herein.

205.   Defendants' discriminatory conduct, which was based on Beverley's race,

ethnicity, age and/or gender, and violated NYC Admin. Code sec. 8-107 et seq.

206.   As a proximate result of Defendants' conduct, Beverley has suffered and

continues to suffer substantial losses, including the loss of employment opportunities, and

other employment benefits.

207.   As a proximate result of the foregoing, Beverley  has suffered mental

 anguish, emotional distress and loss of enjoyment of life.  Beverley has incurred damages

thereby.

208.   The conduct of  Defendants was outrageous and malicious, was intended to

injure Beverley, and was done with reckless indifference to Beverley's protected civil

rights, entitling Beverley to an award of punitive damages.

COUNT VI AGAINST DEFENDANTS
HHC AND KATZ, BREZENOFF AND
ANATHARAM IN THEIR OFFICIAL
AND INDIVIDUAL CAPACITIES

209.   Beverley repeats and realleges each and every allegation set forth in

paragraphs 1 through 175 of this Complaint, with the same force and effect as if set forth

herein.

210.   Defendants' conduct had a disparate impact on Beverley because of her race, ethnicity, age and gender, violated NYC Admin. Code sec. 8-107 et seq.

211.   As a proximate result of Defendants' conduct, Beverley has suffered and continues to suffer substantial losses, including the loss of employment opportunities, and other employment benefits.

212.   As a proximate result of the foregoing, Beverley has suffered mental anguish, emotional distress and loss of enjoyment of life.  Beverley has incurred damages thereby.

213.   The conduct of Defendants was outrageous and malicious, was intended to injure Beverley, and was done with reckless indifference to Beverley's protected civil rights, entitling Beverley to an award of punitive damages.

WHEREFORE, Beverley prays that this Court grant judgment to her containing the following relief:

1.   A declaration that the acts and practices complained of herein are in violation of 42 U.S.C. sec. 1981, 42 U.S.C. sec. 1983, and NYC Admin. Code sec. 8-107 et seq.

2.   An order prohibiting Defendants from continuing or maintaining the policy, practice and/or custom of denying job benefits and opportunities to employees on the basis of race, ethnicity, age and gender.

3.   An award to Beverley of actual damages in an amount to be determined at

trial for benefits and promotional opportunities.

4.      An award of damages in an amount to be determined at trial to compensate

Beverley for mental anguish, humiliation, embarrassment, and emotional injury.

5.      An award of punitive damages in an amount to be determined at trial.

6.      An order enjoining Defendants from engaging the wrongful acts and

practices complained of herein.

7.      An award of pre-judgment and post-judgment interest.

8.      An award of reasonable attorney's fees and costs of this action.

9.      An award of such other and further relief, as this Court may deem just and

proper.

Pursuant to Fed. R. Civ. Proc. 38, Beverley demands a trial by jury of all issues of

 fact in this action.


Dated:      New York, New York
             April 5, 2019



                              LAW OFFICE OF SANDRA D. PARKER

                              By: /s/ Sandra D. Parker
                                    Sandra D. Parker
                                    444 Madison Avenue, Suite 1710
                                    New York, NY 10022
                                    (212) 317-2883
                                    Attorney for Plaintiff