UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
MAUVAREEN BEVERLEY,


                              Plaintiff,


        -against-                                        SECOND AMENDED
                                                         COMPLAINT AND
                                                         JURY DEMAND_____


NEW YORK CITY HEALTH AND                                 18 CIV. 08486 (ER)
HOSPITALS CORP., MITCHELL
KATZ, Individually and as Chief Operating
Officer and President of New York City Health
and Hospitals Corp., STANLEY BREZENOFF,
Individually and as Interim Chief Operating
Officer and President of New York City Health
and Hospitals Corp., PLACHIKKAT V.
ANANTHARAM, Individually and as Chief
Financial Officer of New York City Health and
Hospitals Corp.,


                              Defendants.
-------------------------------------------------------------x

        Plaintiff, Mauvareen Beverley, for her Second Amended Complaint (Complaint)

against the Defendants, respectfully alleges as follows:

                        JURISDICTION AND VENUE

        1.      Plaintiff Mauraveen Beverley (Beverley) brings this action, pursuant

to  the Civil Rights Act of 1871 (as amended), 42 U.S.C. §1983, for declaratory judgment,

injunctive relief and damages against the Defendants to redress the deprivation under

color of state law, of the rights, privileges and immunities secured to Beverley, by the

Fourteenth Amendment of the United States Constitution.

2.      Defendants Mitchell Katz, Stanley Brezenoff and Plachikkat V. Anantharam subjected Beverley to discriminatory treatment because of her race, age and Caribbean descent, in violation of 42 U.S.C. § 1983.

3.      Beverley further brings this action pursuant to the New York City Human Rights Law, N.Y. Admin. Code §§ 8-107 *et seq.,* for declaratory judgment, injunctive relief and damages against the Defendants New York City Health and Hospitals. Corp., Mitchell Katz, Stanley Brezenoff and Plachikkat V. Anantharam, for unlawful employment practices and employment discrimination, based on Beverley's race, age and Caribbean descent, and for creating a hostile environment in which she was forced to work.

4       The Defendants subjected Beverley to disparate and unequal treatment based on her race, age and Caribbean descent, and created a hostile environment in which she was forced to work.

5.      Jurisdiction over the subject matter of this Complaint is conferred on this Court pursuant to 28 U.S.C. §§1331 and 1343, and 42 U.S.C. §1983.  This Court's pendent jurisdiction is invoked pursuant to 28 U.S.C. §1367(a). Beverley further invokes this Court's jurisdiction pursuant to 28 U.S.C. §§ 2201 and 2202.

6.      The venue of this action is properly placed in the Southern District of New York, pursuant to 28 U.S.C. §1391(b).

PARTIES

7.      Beverley  is an African-American female citizen of the United States.

8.      Beverley was born in 1952, is over sixty-nine (69) years old, and is of Caribbean descent.

9.      Beginning in 2007 Beverley worked in various positions within the Defendant New York City Health and Hospitals Corp. organization (H + H), until in or about January 2018, when Defendants wrongfully terminated her employment based on their animus directed against Beverley because of her race, age and Caribbean descent.

10.     At all times relevant herein Beverley was an "employee" of the Defendants, within the meaning of the NYCHRL.

11.     At all times relevant herein, Defendants were Beverley's "employers" within the meaning of NYCHRL.

12.     Upon information and belief, the Defendant  H+H  at all times relevant herein, was and continues to be a public benefit corporation, which provides health care services to the New York City public, through a network of eleven (11) acute care hospitals, and health care facilities.

13.      Upon information and belief, the principal office of H+H is located at 125 Worth Street, New York, NY 10013.

14.     Upon information and belief since in or about January 2018, Defendant Mitchell Katz (Katz) has been and continues to be the President and Chief Executive

Officer of Defendant H+H.

15.    Upon information and belief at all times relevant herein, and in particular prior to January 2018,  Defendant Stanley Brezenoff (Brezenoff) was the Interim President and Chief Executive Officer of Defendant H+H.

16.    Upon information and belief, at all times relevant herein, and in particular beginning in or about 2016, Defendant  Plachikkat V. Anantharam (Anantharam) was the Chief Financial Officer of Defendant H+H, and the head of the Central Office Finance of H+H.

17.    Beverley sues the Defendants Katz, Brezenoff and Anantharam (collectively referred to the Individual Defendants) in their individual capacities for violating Beverley's right of equal protection provided pursuant to the Fourteenth Amendment of the United States Constitution.

18.    The Individual Defendants subjected Beverley to disparate treatment based on her race, national origin and age in violation of 42 U.S.C. § 1983, when they terminated Beverley's employment and replaced her with a non-Caribbean Caucasian employee, who is substantially younger than Beverley, and who among other things lacks the qualifications and experience to perform her duties.

19.    Beverley sues the Defendant H+H and the Individual Defendants for subjecting her to the foregoing disparate treatment based on her race, national origin and age and for creating a hostile environment in which she was forced to work, all in

violation of N.Y. Admin. Code §§ 101-8 *et seq.*

FACTUAL BACKGROUND

20.     Upon information and belief, Defendant H+H established and maintains the

Equal Employment Opportunity Program and Affirmative Action Plan (EEO Plan), also

known as Operating Procedure No. 20-32.

21.     Upon information and belief, the EEO Plan established policies and

procedures regarding among other things, the recruitment and retention of senior

managers, officers and directors working for H+H, including Beverley.

22.     Upon information and belief, Defendants Katz and Brezenoff are responsible

for and accountable for implementation and enforcement of the policies and procedures set

forth in the EEO Plan.

23.     Upon information and belief, the EEO Plan requires Defendant Anantharam

and other employees working for  Defendant H+H to adhere to its terms and provisions.

24.     Among other things, the EEO Plan prohibits discrimination based on race,

national origin, and age directed against applicants for employment with H+H and

employees working for H+H, prohibits discriminatory personnel actions, and mandates a

fair and prompt disposition of claims related to the applications of the policies set forth

therein.

25.     The EEO Plan mandates that personnel actions and decisions be based solely

on the employees' qualifications, demonstrated ability, performance or "established

5

objective criteria."

26.     The EEO Plan requires Defendants to fairly and impartially consider and promptly resolve complaints related to the applications of H+H's Equal Employment Opportunity Program.

27.     By virtue of the discriminatory conduct described herein, Defendants have violated the terms of said EEO Plan.

28.     Defendants and in particular Defendant Anantharam among other things, did not make personnel decisions based on solely on objective criteria or based solely on the employees' qualifications, demonstrated ability, and performance.

29.     Defendants and in particular Defendant Anantharam did not implement or utilize a system for conducting evaluations of the management employees working in the Central Office Finance of H+H.

30.     Defendants and in particular Defendant Anantharam among other things, continued the practice of assessing the competence and performance of management employees, employed in Central Office Finance, based on their race, national origin, and/or age.

31.     Defendants engaged in the foregoing conduct during Beverley's employment at Central Office Finance of H+H.

32.     In or about 1981 Beverley earned the M.D. Degree from the University of Buffalo School of Medicine.

33.    In or about 1984 Beverley completed her internship and residency in Internal Medicine, at Harlem Hospital, one of the several hospitals within the H+H system of hospitals and health care facilities.

34.    More than a decade after completing her internship and residency, Beverley began working in or about 2007 for H+H, as an Associate Executive Director of Care Management at the Queens Health Network.

35.    Beverley worked at the Queens Health Network for approximately four (4) years, until in or about 2011, when she began working in the position of Deputy Executive Director, Care Management at Kings County Hospital.

36.    In or about 2015 Beverley moved from her position at Kings County Hospital to H+H's Central Office and specifically to the Central Office Finance of H+H.

37.    The employees in the Central Office Finance of H+H work in various assigned areas of functional responsibilities related to the finances of H+H.

38.    Those areas of functional responsibilities include the Budget, Managed Care and Revenue Cycle.

39.    The Central Office Finance of H+H is headed by the Chief Operating Officer of H+H.

40.    The various titles and positions in Central Office Finance (Finance) which fall below that of the Chief Operating Officer, include comptroller, senior vice president, vice president, assistant vice president and director.

41.     Among the titles and positions in Finance, the position of director is below the rank and status of the assistant vice president position.

42.     Defendant H+H Position Description for the Position Title of Assistant Vice President (AVP) in Finance, states that irrespective of her or his areas of functional responsibilities, the AVP in Finance is granted wide latitude and discretion to exercise "independent initiative and unreviewed action."

43.     An AVP assigned to work on Managed Care is granted the same wide latitude and discretion to exercise "independent initiative and unreviewed action" in the area of Managed Care, as is granted to the AVP assigned to work on the Budget or Revenue Cycle.

44.      Defendant H+H's Position Description for the AVP in Finance, further describes the duties and responsibilities of the AVP to include providing assistance in the development, establishment, implementation and monitoring of policies and programs within Finance and H+H.

45.     In accordance with the foregoing H+H Position Description, the duties and responsibilities of the AVP in Managed Care, includes providing assistance in the development, establishment, implementation and monitoring of Managed Care policies and programs within Finance and H+H.

46.     During Beverley's tenure as AVP in Finance, and pursuant to the Position Description for the Job Position of AVP in Finance, Beverley was granted wide latitude

and discretion to "exercise independent initiative and unreviewed action" with respect to her assignments and projects, until Defendant Anantharam became head of H+H and reduced and diminished her latitude, discretion and responsibilities.

47.    During Beverley's tenure as AVP in Finance, and pursuant to the Defendant H+H's Position Description for the Job Position of AVP in Finance, Beverley provided assistance in the development, establishment, implementation and monitoring of the policies and programs related to the projects she was assigned.

48.    After Defendant Anantharam became head of Finance, he reduced and diminished her authority and responsibilities, including eliminating the latitude and discretion she previously had to "exercise independent initiative and unreviewed action" with respect her assignments and projects.

49.    Defendant Anantharam did not diminish or reduce of the latitude and discretion of the younger Caucasian AVPs in Finance, to "exercise independent and unreviewed action" in their functional areas of responsibility.

50.    Beverley worked in Finance for approximately three (3) years.

51.    She began working in the position of AVP, Physician Advisor in Finance/Managed Care, in 2015.

52.    In addition to Beverley, there were Caucasian AVPs and AVPs who were younger than Beverley, including Megan Meagher who worked in Finance.

53.    Upon information and belief Megan Meagher (Meagher) is less than forty

(40) years old, and her functional responsibilities involved working on Managed Care matters in Finance.

54.    The employees working in Finance, who held the position of AVP in Finance reported directly to and were directly supervised by the head of Finance.

55.    In or about 2017, during the tenure of Defendant Anantharam as head of Finance, he refused to supervise Beverley, refused and rejected the responsibility of supervising her, refused to have Beverley report to him, while he continued to supervise and have the Caucasian AVPs in Finance report to him.

56.    In or about 2017, during the tenure of Defendant Anantharam as head of Finance, he appointed a Caucasian employee holding the position of director, which was below that of the AVP position Beverley held, to supervise Beverley and to have her report to said Caucasian director.

57.    Beverley was the only AVP in Finance, whom Defendant Anantharam mandated that she report to a subordinate employee, holding a status and position below that of an AVP.

58.    That was not the case in 2015, when Beverley began working in Finance.

59.    In 2015, Marlene Zurack (Zurack) was the head of Finance. She held the position of Senior Vice President and Chief Financial Officer of H+H.

60.    During Zurack's tenure as head of Finance, Beverley and the other AVPs in Finance reported directly to Zurack.

61.    Beverley's duties included serving as the Physician Advisor to Finance and

as the primary contact in Finance for medical necessity denials and appeals initiatives;

developing and managing H+H standard workflow processes related to medical necessity

denials and appeals; and providing clinical information, education and guidance to H+H's

Utilization Management departments regarding medical necessity documentation.

62.     Beverley performed her duties in an exemplary manner.

63.     Defendants charged Beverley with performing the above described duties

with  respect to H+H and the eleven (11) acute care hospitals within the H+H network of

hospitals and health care facilities.

64.     Despite Defendants' acknowledgment that Beverley needed a

personnel support in the form of an assistant to perform her duties, and despite Beverley's

requests for support personnel, Defendant Anantharam denied her an assistant, while

providing the Caucasian AVPs in Finance, such as Meagher and others, with support

personnel.

65.     Defendants further provided a younger Caucasian employee, holding the

position of director with support staff.

66.      As part of her direct supervision of the AVPs in Finance, Zurack held one

on one meetings with the AVPs in Finance, to discuss the projects on which they were

working, to obtain updates on those projects, and to provide insight, assistance and

approval of projects they had undertaken or planned to undertake.

67.     Zurack held the foregoing one and one meetings with all AVPs in Finance,

including Beverley, Meagher and other AVPs.

68.     In or about 2016, Zurack left her position with Defendant H+H.

69.     Defendant H+H replaced Zurack with Defendant Anantharam.

70.     Defendant Anantharam is of Indian-descent and assumed the position of head of Finance and Chief Financial Officer, in or about 2016.

71.     Defendant Anantharam also replaced Zurack as the direct supervisor of Beverley and the other AVPs in Finance.

72.     In or about 2016, during a meeting Beverley had with the manager of "Breakthrough" improvement at Finance, said manager agreed with Beverley that she needed a staff, to support her work involving the eleven (11) health care facilities within the H+H system.

73.     In or about 2016 Beverley asked Defendant Anantharam for a staff to support and assist her in performing her duties.

74.     Defendant Anantharam denied Beverley's request, while providing staff to support the Caucasian AVPs in Finance, such as Meagher as well as providing directors such as Robert Melican with staff support.

75.     During his tenure as head of Finance, Defendant Anantharam continued the practice of holding one and one meetings with the managers in Finance, including AVP Meager.  He also held one and one meetings with Beverley.

76.     During those one on one meetings, the AVPs including Beverley, discussed the projects on which they were working, obtained and provided updates on those projects, and obtained insight, assistance and approval of projects they had undertaken or planned to

undertake.

77.    In 2017, Defendant Anantharam, after initially holding a few one and one

meetings with Beverley, discontinued the practice, including dismissing and denying

Beverley's requests to meet with him about her work.

78.    Defendant Anantharam discontinued holding one and one meetings with

Beverley, while continuing to hold one and one meetings with the Caucasian AVPs and

other Caucasian managers in Finance.

79.    As an alternative to the one and one meetings she previously had with

Defendant Anantharam regarding her work, Beverley sent him emails explaining the

progress of her work, and seeking his input and approval of her projects and work.

80.    In his response to Beverley's emails regarding her work, Defendant

Anantharam complained to Beverley that he was receiving too many emails from her.

81.    Upon information and belief, Defendant Anantharam did not complain about

the email and other communications he received from other AVPs in Finance such as

Meagher.

82.    He was receptive to and responded positively to their concerns and ideas.

83.    During staff meetings, Defendant Anantharam responded positively to the

comments, suggestions and input given by other AVPs such as Meager.

84.    During staff meetings, Defendant Anantharam responded to comments,

suggestions and input Beverley gave by challenging or dismissing them, and treating them,

as unworthy of consideration.

85.     With respect to Beverley's comments, suggestions and input Defendant Anantharam was dismissive.

86.     Defendant Anantharam treated Beverley's comments, inputs and suggestions as not being worthy of consideration or discussion.

87.     Notwithstanding the foregoing treatment, during her tenure in Finance, Beverley developed and implemented a medical necessity denial and appeal  process, which resulted in recoupment of approximately $8 Million Dollars.

88.     Other initiatives, projects and programs on which Beverley worked, resulted in savings to Defendant H+H of $24 Million Dollars, and in increased revenues by more than $8.5 Million Dollars.

89.     In January 2017 Beverley asked Defendant Anantharam for a raise in her salary.  He denied her request.

90.     Prior to and during Beverley's entire tenure in Finance, Defendants had not established and did not establish or implement a system to evaluate the performance of the managers in Finance, including those holding the positions of AVP.

91.     Defendants failure to establish and implement a system for the evaluation of the performance of the managers in Finance, and in particular a system based solely on objective criteria violated H+H's EEO Plan.

92.     In recognition of this continuing violation of the EEO Plan, in or about September 2017, the Program Manager of H+H's Human Resource Department (HR), held a meeting with the managers in Finance.  She stated that HR had mandated the institution

14

of performance evaluations for all managers and staff in Finance.

93.    She also stated that the performance evaluations for all managers and staff in Finance had to be done by December 2017.

94.    Defendants ignored that mandate and failed to conduct any evaluations of the Finance managers.

95.    Defendant Anantharam continued to supervise Beverley until in or about August 2017, when he told Beverley that he would no longer supervisor her, that she would no longer report to him, that she would now be supervised by and report to Robert Melican (Melican).

96.    Melican who is an approximately forty (40)  years old Caucasian male, held the position of director in Finance, a position which was junior to and below that of the AVP position Beverley held.

97.    Beverley was the only AVP in Finance whom Defendant Anantharam refused to supervisor.

98.    Beverley was the only AVP in Finance whom Defendant Anantharam required to report to someone holding a title and position junior to the position of AVP.

99.    In instituting this new reporting requirement solely for Beverley, Defendant Anantharam among other things, reduced her authority and responsibilities, by eliminating the latitude and discretion she previously had to "exercise independent initiative and unreviewed action" with respect  her assignments and projects.

100.    Beverley now was required to obtain Melican's approval for all of the work

she undertook in her position as AVP.

101.    Defendant Anantharam further required Beverley to obtain Melican's approval regarding the time she devoted to her projects and assignments, directing her to obtain Melican's review and approval of all her time sheets.

102.    No other AVP in Finance was required to work under the foregoing terms and conditions.

103.    The Caucasian and younger AVPs such as Meagher were not required to be supervised  by and report to someone holding a title or position lower than the position they held in Finance.

104.    The Caucasian and younger AVPs in Finance such as Meagher had the latitude and discretion to "exercise independent initiative and unreviewed action" with respect to their assignments and projects.

105.    In or about August 2017, upon being told of this new reporting requirement, Beverley expressed objections, stating that she was being required to report to a subordinate employee, and pointing out that she was the only AVP in Finance who was required to work on those terms and conditions.

106.    Defendant Anantharam responded that he would hold a meeting with Beverley and Melican to resolve Beverley's objections, but never held any meeting to address Beverley's objections to the new reporting requirement.

107.    Defendant Anantharam further removed himself from supervising Beverley, by requiring her to obtain the approval of Maxine Katz, an approximately fifty (50) years

Caucasian for all projects on which she was working.

108.   Neither Melican nor Maxine Katz had the technical expertise, such as the expertise of a clinician that Beverley possessed, to work on the medical necessity projects.

109.   Upon information and belief Melican had a background in law, and Maxine Katz had a background in education.

110.   The foregoing working conditions, interfered with and prevented Beverley from properly executing her duties, resulted in Melican and/or Maxine Katz making errors and mistakes on projects to which Beverley was assigned or on which she was listed as the project manager, and then attempting to blame Beverley for their errors and mistakes.

111.   For example, on or about October 3, 2017 Beverley learned that Maxine Katz and Melican had produced a report laden with errors, on a project for which Beverley was supposed to be in charge.

112.   Beverley learned that Melican had produced the report and sent error riddled report to the Finance Program Management Office, only after the manager of that office contacted her about the errors, and asking her to correct the report.

113.   The manager of the Program Management Office contacted Beverley because she was supposed to be the project manager of project about which the report had been produced.

114.   Melican and Maxine Katz also barred Beverley from attending all meetings related to the projects on which she was working, insisting that only they attend those meetings.

17

115.   Melican and Maxine Katz further barred Beverley from communicating with anyone regarding the projects on which she was working, insisting instead that they do all the communicating.

116.   Maxine Katz also falsely blamed Beverley for not providing certain data to the Transformation Office, when Beverley had timely furnished the information.

117.   Beginning on or about October 3, 2017 and continuing throughout October 2017 Beverly voiced her objections to and complained to Defendant Anantharam about being prevented from exercising the same authority over projects as the younger Caucasian AVPs exercised over their projects, including attending meetings and  communicating with persons outside of Finance regarding those projects.

118.   Beverley further complained about errors being made on projects and reports to which she was assigned and on which she was supposed to be the project manager, and then being falsely blamed for the errors, including the Melican report sent to the Program Management Office.

119.   Defendant Anantharam dismissed her complaints, and failed to take any action again Melican or Maxine Katz for the mistakes and errors.

120.   On or about November 1, 2017 Defendant Anantharam called Beverley into his office and told her she should look for another job.

121.   Defendant Anantharam also stated he did not know what Beverley did in Finance.

122.   Beginning on November 1, 2017 and continuing until Beverley's termination

18

Defendant Anantharam barred and prevented Beverley from attending managers meetings, she previously attended.

123.    On November 1, 2017, Defendant Anantharam's chief of staff, Angeles Pai specifically told Beverley that she was not to attend any managers meetings.

124.    Beginning on November 1, 2017 and continuing through Beverley's termination, Defendant Anantharam excluded and barred Beverley from participating in huddles with the managers in Finance, and from receiving emails and other correspondence sent to the managers in Finance.

125.    Beverley was the only manager in Finance who was subject to the foregoing treatment.

126.    Defendant Anantharam also questioned Beverley about her Carribean background and made comments about his lack of affinity for the United States' "African-American experience."

127.    Approximately one month after telling Beverley to look for another job, on or about December 18, 2017, Defendant Anantharam approached Beverley in a threatening manner and told her she had two (2) days to submit a letter of resignation from her position in Finance.

128.    Defendant Anantharam threatened Beverley on or about December 18, 2017 that if she did not submit the letter of resignation, he would take her to Human Resources. He did not explain what would happen if and when he took her to Human Resources.

129.    He also did not point to any poor performance or deficiency in her

performance when he demanded her letter of resignation, and threatened to take her to Human Resources.

130.    On December 18, 2017 Beverley wrote to Defendant Anantharam, repeating her objections to the unfair treatment to which she was being subjected, including the requirement that she report to Melican, the errors Melican made on reports which he falsely attributed to Beverley, his demand that she find a job, followed by his demand she resign in two days, or face the threat of being taken Human Resources.

131.    Beverley further complained that Anantharam's action was not based on any deficiencies in her performance.

132.    Beverley provided Defendant Brezenoff with a copy of her complaint to Defendant Anantharam.  Defendant Brezenoff, ignored the complaint.

133.    Defendant Anantharam also ignored Beverley's complaints, waiting until two (2) days before Beverley was ordered to attend a termination meeting with personnel from Human Resources, to respond to her complaints.

134.    The above described treatment and conduct created a hostile environment in which Beverley was forced to work.

135.    In a January 3, 2018 response to Beverley's December 18, 2017 complaints, Defendant Anantharam now pointed to an alleged an "reorganization," as the reason for her termination.

136.    On November 1, 2017 when Defendant Anantharam demanded that Beverley find another job, he did not mention any alleged "reorganization" as the reason

20

for his demand or the reason she needed to find another job.

137.    Defendants and in particular, Defendant Anantharam did not issue any announcement or notice informing employees of the alleged "reorganization."

138.    Defendants and in particular, Defendant Anantharam did not state the nature of the alleged "reorganization," or describe an aspect of the alleged "reorganization."

139.    Defendants did not eliminate Beverley's position.

140.    Following Beverley's termination, Defendants reassigned Beverley's duties to Melican and promptly promoted him to the position of AVP with an accompanying salary increase.

141.     Defendant Anantharam had Beverley train Melican to perform her duties, terminated her employment, and then had him replace her.

142.    On January 5, 2018, during a meeting with the Director of Human Resources, Beverley was terminated effective that day.

143.    He stated the termination was due to an alleged "organizational changes" and "restructuring."

144.    He did not explain the nature of the alleged "organizational changes," "restructuring," or what was undergoing alleged "organizational changes" or "restructuring."

145.    Defendants did not distribute and Beverley did not receive  any announcement or communication regarding the alleged "organizational changes" and "restructuring."

146.    Beverley was the only employee in Finance who was terminated on January 5, 2018.

147.    Beverley was the only employee in Finance who was terminated as a result of the alleged "organizational changes" and "restructuring."

148.    On January 5, 2018 Beverley complained to Defendants and in particular Defendant Katz, regarding her termination. Defendants and in particular Defendant Katz ignored her complaints.

149.    Following the meeting on January 5, 2018 where Defendants terminated her employment, Beverley sought to remain on the payroll of H+H for a limited time period, during which she would seek another position at H+H or with another employer.

150.    Beverley suggested an approximately three (3) months period or until in or about March 2018, to remain on the payroll while seeking new employment.

151.    Defendants rejected Beverley's suggestion and request.

152.    Notwithstanding the purported "organizational changes" and "restructuring" Defendants' increased the Finance personnel, by hiring Caucasian and younger employees to fill positions in Finance.

153.    In or about 2018, following Beverley's termination, Defendants promoted Melican from the position of director to AVP, and assigned him the duties Beverley performed when she was employed in Finance.  Defendants further raised Melican's salary.

154.    Defendants promoted Melican and replaced Beverley with Melican, despite

22

the fact that he lacks the requisite skills and expertise to perform those duties.

155.    Defendants promoted Melican despite the fact that he committed numerous and serious errors on the projects he was assigned, including issuing in or about October 3, 2017 an error riddled report, for which he tried to blame Beverley.

156.    Defendants took no remedial actions against Melican for his deficient performance, and instead rewarded him with a promotion and a salary increase.

157.    Despite Beverley's stellar performance in her position as AVP, Defendants terminated Beverley's employment and replaced her with Melican, a deficient performing employee who is Caucasian, who is of non-Caribbean descent and who is substantially younger than Beverley.

158.    When Defendants erroneously believed that Beverley had made an error in providing certain data for their use, they moved swiftly to condemn and publicly berate and humiliate her before her colleagues and before a third party vendor, falsely accusing her of incompetence.

159.    Defendants further sought to bar Beverley from continuing to work on the projects that they erroneously believed were the result of her alleged errors and deficient execution of her duties.

160.    Defendants failed and refused to apologize to Beverley after she demonstrated, it was Melican who had made the numerous errors.

161.    The Defendants engaged in the foregoing conduct because of their discriminatory animus directed against Beverley because of her race, national origin and

age.

162.    Despite her efforts, including applications for vacancies within H+H for which she was qualified,  Beverley has not found comparable employment.

COUNT I AGAINST DEFENDANTS
KATZ, BREZENOFF AND
ANANTHARAM IN THEIR INDIVIDUAL
CAPACITIES

163.    Beverley repeats and realleges each and every allegation set forth in paragraphs 1 through 162  this Complaint, with the same force and effect as if set forth herein.

164.    The Individual Defendants terminated Beverley in or about January 2018 and thereafter replaced her with Melican, a non-Caribbean Caucasian employee, who lacked the requisite qualifications and experience to perform the duties Beverley performed.

165.    The Individual Defendants terminated Beverley in or about January 2018 and thereafter replaced her with Melican, a non-Caribbean Caucasian employee, whose performance was deficient and substandard.

166.    By virtue of the foregoing actions and conduct, the Individual Defendants subjected Beverley to disparate treatment because of her race and national origin.

167.    The Individual Defendants deprived Beverley of her constitutional rights of equal protection under the law in violation of 42 U.S.C. §1983.

168.    The Individual Defendants' conduct was willful and intentional and caused

the deprivation of Beverley's constitutional rights of equal protection of the law.

169.    At all times relevant herein, the Individual Defendants acted under the color

of state law in  willfully and purposefully depriving Beverley of her constitutionally

guaranteed rights.

170.    As a proximate result of the Individual Defendants' discriminatory conduct,

Beverley  has suffered and continues to suffer impairment and damage to her good name

and reputation.

171.    As a proximate result of the Individual Defendants' discriminatory conduct,

Beverley has suffered and continues to suffer severe lasting embarrassment, anxiety,

humiliation, shame and anguish, and other incidental and consequential damages and

expenses.

> COUNT II AGAINST DEFENDANTS
> KATZ, BREZENOFF AND
> ANANTHARAM IN THEIR INDIVIDUAL
> CAPACITIES

172.    Beverley repeats and realleges each and every allegation set forth in

paragraphs 1 through 162 of this Complaint, with the same force and effect as if set forth

herein.

173.    The Individual Defendants terminated Beverley in or about January 2018

and thereafter replaced her with Melican, an employee who is substantially younger than

Beverley, and who lacked the requisite qualifications and experience to perform the duties

Beverley performed.

174.    The Individual Defendants terminated Beverley in or about January 2018 and thereafter replaced her with Melican, a substantially younger employee, whose performance was deficient and substandard.

175.    By virtue of the foregoing conduct, the Individual Defendants subjected Beverley to disparate treatment because of her age.

176.    The Individual Defendants deprived Beverley of her constitutional rights of equal protection under the law in violation of 42 U.S.C. §1983.

177.    The Individual Defendants' conduct was willful and intentional and caused the deprivation of Beverley's constitutional rights of equal protection of the law.

178.    At all times relevant herein, the Individual Defendants acted under the color of state law in willfully and purposefully depriving Beverley of her constitutionally guaranteed rights.

179.    As a proximate result of the Individual Defendants' discriminatory conduct, Beverley  has suffered and continues to suffer impairment and damage to her good name and reputation.

180.    As a proximate result of the Individual Defendants' discriminatory conduct, Beverley has suffered and continues to suffer severe lasting embarrassment, anxiety, humiliation, shame and anguish, and other incidental and consequential damages and expenses.

## COUNT III AGAINST DEFENDANTS
## H+H, KATZ, BREZENOFF AND
## ANANTHARAM

181.    Beverley repeats and realleges each and every allegation set forth in

paragraphs 1 through 162 of this Complaint, with the same force and effect as if set forth

herein.

182.  In January 2018 the Defendants terminated Beverley and thereafter replaced

her with Melican, an employee, who is a non-Caribbean Caucasian and substantially

younger than Beverley.

183.    Following her termination in or about January 2018, the Defendants

replaced Beverley with Melican, who lacked the requisite qualifications and experience to

perform the duties Beverley performed.

184.    The  Defendants terminated Beverley in or about January 2018 and

thereafter replaced her with Melican, whose performance was deficient and substandard.

185.    By virtue of the foregoing conduct, the Defendants engaged in

discriminatory conduct directed against  Beverley because of her race, age and national

origin.

186.    Defendants' discriminatory conduct and treatment of Beverley,  which was

based on Beverley's race, age and national origin, violated NYC Admin. Code §§ 8-107 *et*

*seq*.

187.    As a proximate result of Defendants' conduct, Beverley has suffered and

continues to suffer substantial losses, including the loss of employment opportunities, and

other employment benefits.

188.    As a proximate result of the foregoing, Beverley has suffered mental anguish, emotional distress and loss of enjoyment of life.  Beverley has incurred damages thereby.

189.    The conduct of Defendants was outrageous and malicious, was intended to injure Beverley, and was done with reckless indifference to Beverley's protected civil rights, entitling Beverley to an award of punitive damages.

### COUNT IV AGAINST DEFENDANTS H+H, KATZ, BREZENOFF AND ANANTHARAM

190.    Beverley repeats and realleges each and every allegation set forth in paragraphs 1 through 162 and 182 through 185 of this Complaint, with the same force and effect as if set forth herein.

191.    The conduct and treatment to which the Defendants subjected Beverley during her employment with H+H created a hostile environment in which she was forced to work.

192.    Defendants' discriminatory conduct and treatment of Beverley violated NYC Admin. Code §§8-107 *et seq.*

193.    As a proximate result of Defendants' conduct, Beverley has suffered and continues to suffer substantial losses, including the loss of employment opportunities, and other employment benefits.

194.    As a proximate result of the foregoing, Beverley has suffered mental

anguish, emotional distress and loss of enjoyment of life.  Beverley has incurred damages thereby.

195.    The conduct of  Defendants was outrageous and malicious, was intended to injure Beverley, and was done with reckless indifference to Beverley's protected civil rights, entitling Beverley to an award of punitive damages.

WHEREFORE, Beverley prays that this Court grant judgment to her containing the following relief:

1.    A declaration that the conduct complained of herein is in violation of  42 U.S.C. § 1983, and NYC Admin. Code §§ 8-107 *et seq.*

2.    An order prohibiting Defendants from continuing to engage in the conduct of denying job benefits and opportunities to employees on the basis of race, age and national origin.

3.    An award to Beverley of actual damages in an amount to be determined at trial for benefits and promotional opportunities.

4.    An award of damages in an amount to be determined at trial to compensate Beverley for mental anguish, humiliation, embarrassment, and emotional injury.

5.    An award of punitive damages in an amount to be determined at trial.

6.    An order enjoining Defendants from engaging the wrongful acts and practices complained of herein.

7.    An award of pre-judgment and post-judgment interest.

8.    An award of reasonable attorney's fees and costs of this action.

9.      An award of such other and further relief, as this Court may deem just and proper.

Pursuant to Fed. R. Civ. Proc. 38, Beverley demands a trial by jury of all issues of fact in this action.

Dated:       New York, New York
             April 13, 2022


                          LAW OFFICE OF SANDRA D. PARKER

                          By: /s/ Sandra D. Parker_____
                                Sandra D. Parker
                                110 East 59th Street, Suite 3200
                                New York, NY 10022
                                (212) 317-2883
                                Attorney for Plaintiff